# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROSCOE H. BAKER, JR.,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00068 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## *I. Background and Standard of Review*

The plaintiff, Roscoe H. Baker, Jr., filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2003 & Supp. 2008). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

-1-

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Baker protectively filed his application for SSI on January 20, 2005, alleging disability as of August 1, 1997, due to back, leg and arm pain, headaches, depression, anxiety, sleep problems, memory loss and difficulty concentrating.[1] (Record, ("R."), at 1, 12.) The claim was denied initially and upon reconsideration. (R. at 64-65.) Baker then requested a hearing before an administrative law judge, ("ALJ"), and a hearing was held on August 1, 2006, at which Baker testified and was represented by counsel. (R. at 29-50.)

By decision dated August 25, 2006, the ALJ denied Baker's claim. (R. at 10-20.) The ALJ found that Baker had not engaged in any substantial gainful activity since August 1, 1997, the alleged onset date. (R. at 14.) The ALJ determined that the medical evidence established that Baker suffered from severe impairments, namely back pain, cervical pain, depression and anxiety. (R. at 14.) However, he found that

---

[1]The record does not contain a copy of the claimant's application for SSI or her Disability Report - Adult form. Thus, the undersigned will rely on the representations of the administrative law judge and counsel for the parties for information regarding the date of the application and the impairments upon which the claimant's SSI claim is based.

The court also notes that the claimant filed previous applications for SSI and disability insurance benefits in October 1997. Those applications were denied by an administrative law judge on December 14, 2000. (R. at 51-60.) It does not appear from the record that the claimant pursued his administrative remedies with regard to the previous applications.

-2-

Baker's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ further found that Baker retained the residual functional capacity to perform simple, low stress light work.[2] (R. at 17.) Thus, he determined that Baker was unable to perform his past relevant work. (R. at 18.) In addition, the ALJ noted that transferability of job skills was immaterial to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that Baker was not disabled, regardless of whether he possessed transferable job skills. (R. at 19.) Based on Baker's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that there were jobs existing in significant numbers in the national economy that Baker could perform, including jobs such as a grader/sorter, a houseman, a janitor, a farm worker, a hand packer, a laborer and a machine tender. (R. at 19.) Therefore, the ALJ concluded that Baker was not under a disability as defined in the Act and was not entitled to benefits. *See* 20 C.F.R. § 416.920(g) (2008).

After the ALJ issued his decision, Baker pursued his administrative appeals, but the Appeals Council denied his request for review. (R. at 4-7.) Baker then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2008). The case is before this court on Baker's motion for summary judgment, which was filed June 1, 2009, and the Commissioner's motion for summary judgment, which was filed June 30, 2009.

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. § 416.967(b) (2008).

## II. Facts

Baker was born in 1967, (R. at 18, 33), which classifies him as a "younger person" under 20 C.F.R. § 416.963(c). According to the record, Baker earned a general equivalency development diploma, ("GED"), (R. at 32, 55, 66-70), and has past relevant work as a construction laborer, a dump truck driver, a retail store clerk/stocker, an automobile parts clerk/delivery man and as an employee for an automobile repair business. (R. at 32, 55.)

At the hearing before the ALJ on August 1, 2006, Baker testified that he last attempted to work in March 2006 as a janitor, but noted that he only kept the job for approximately one month. (R. at 33.) He explained that he was forced to quit the job due to back and leg pain. (R. at 34.) Baker noted that, other than the brief employment in March 2006, he last worked in 2000. (R. at 34.) Baker stated that he ceased work in 2000 due to chronic back pain and numbness in one of his legs, noting that he continued to suffer from those problems at the time of the hearing. (R. at 34.) He further testified that his back pain originated from an incident that occurred when he was shoveling coal into a basement, stating that the pain "gradually . . . just got worse." (R. at 34.) Baker also explained that he was in a car accident in 2003, which exacerbated his back problems and caused numbness and tingling in both legs. (R. at 34.) Baker also reported problems such as headaches, left arm pain and insomnia. (R. at 34-35.)

Baker explained that his physical problems contributed to certain emotional problems, indicating that he was depressed because he was unable to participate in

-4-

activities that he used to enjoy. (R. at 35.) Specifically, Baker testified that he no longer enjoyed driving. (R. at 35.) Baker testified that he treated his conditions with medications such as Lortab, Soma, Celexa and Vytorin. (R. at 35.) He noted that he had not undergone surgery or physical therapy to treat his problems, however, he did state that he had been given injections to treat his back pain. (R. at 35.) He indicated that the injections made his pain worse. (R. at 36.)

Baker testified that his condition limited his ability to sit, causing him to frequently squirm. (R. at 36.) He stated that he could only sit for approximately 10 minutes before his discomfort forced him to get up and move around. (R. at 36.) He also explained that he was unable to stand for extended times and that he had to walk around to ease the pain, which eventually forced him to sit or lie down. (R. at 36.) Baker estimated that he could lift or carry about five pounds, but stated that he was unable to reach. (R. at 37.) He also stated that he could probably push and/or pull enough to vacuum one room in a house, but that he could not vacuum an entire house. (R. at 37.) Baker testified that he could cook quick meals that did not require much preparation, but noted that he did not perform chores such as laundry, dishwashing or grocery shopping. (R. at 37, 39.) He testified that he was able to mow his lawn with a riding lawnmower, explaining that he tried to mow it all at once without breaks, which usually was "30 minutes or more" at a time. (R. at 38.) Baker denied any participation in social activities such as going out to eat or going to the movies. (R. at 39.) He stated that he attended school activities for his children, but pointed out that he often would walk in and out of the activities because sitting for extended periods and being around crowds were both difficult for him. (R. at 39-40.)

Case 2:08-cv-00068-GMW-PMS   Document 17   Filed 08/17/09   Page 5 of 28   Pageid#: 84

Baker testified that he experienced memory problems, stating that everything distracted him.  (R. at 40.)  In addition, he reported that his sleep difficulties allowed him to sleep for a maximum of only three hours.  (R. at 40.)  Baker testified that he normally had to lie down more than four times per day for about 20 to 30 minutes at a time.  (R. at 40.)  He also stated that he did not like to drive, noting that he would only drive on short trips.  (R. at 41.)  Baker testified that he could no longer participate in hobbies such as fishing and drag racing because he could not sit for extended periods.  (R. at 41.)

Baker explained that after his 2003 accident, he experienced shoulder and arm problems, as well as problems with his vision.  (R. at 41.)  He explained that he had soreness and stiffness in his left arm, and he also stated that he experienced tingling in his fingers, noting that he had no strength to grip.  (R. at 41-42.)  Baker testified that, prior to the accident, he had no problems with headaches or his vision, however, he stated that following the accident he began to experience daily headaches and his vision was affected, particularly his peripheral vision.  (R. at 42-43.)  He indicated that these problems were caused by concussion syndrome.  (R. at 44.)  Baker reported no improvement in his headaches.  (R. at 44.)  Baker additionally testified that, at the time of the hearing, he was not receiving regular mental health treatment, but did indicate that he received some treatment a few years prior to the hearing.  (R. at 44.)  He testified that he had been prescribed Celexa to treat his mental problems, but reported that the medication had not helped.  (R. at 45.)

Robert Spangler, a vocational expert, also testified at the hearing.  (R. at 46-49.)  Spangler classified Baker's past work in automobile repair and as a stocker as

-6-

medium[3] and unskilled, his work as a dump truck driver as medium and semi-skilled and his work as a construction laborer as heavy[4] and semi-skilled. (R. at 46.) The ALJ asked Spangler to consider a hypothetical individual of the same age, education and work experience as Baker, who was limited to light work, which included lifting no more than 20 pounds occasionally and 10 pounds frequently, and who could perform only simple, low-stress jobs. (R. at 46-47.) Based upon such a hypothetical, the ALJ ask Spangler if the individual could perform jobs that exist in the regional and national economies. (R. at 47.) Spangler testified that there would be jobs available in the light and simple category, such as a houseman, i.e. a male maid, a janitor, a farm worker, a hand packer, a non-construction worker, a towel folder, a grader and sorter, a production machine tender and a vehicle washer. (R. at 47.) The ALJ then asked Spangler to consider an individual who possessed the limitations contained in Exhibit C-12F,[5] and whether such an individual would be able to perform any jobs. (R. at 47-48.) Spangler testified that there were no jobs that such an individual could perform. (R. at 48.) Next, the ALJ asked Spangler to consider the limitations set forth in Exhibit C-18F,[6] and Spangler again opined that such an individual would be unable to perform any jobs. (R. at 48.) Spangler further indicated that his testimony was

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2008).

[4]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 416.967(d) (2008).

[5]Exhibit C-12F contains the medical records and findings of Dr. R. Michael Moore, M.D., covering the time period of February 2, 2005, to May 2, 2005. (R. at 202-07.)

[6]Exhibit C-18F is a psychological evaluation dated July 10, 2006, completed by John W. Ludgate, Ph.D. (R. at 254-59.)

-7-

consistent with the Dictionary of Occupational Titles. (R. at 49.)

In rendering his decision, the ALJ reviewed medical records from Dr. Gary S. Williams, M.D.; Wellmont Family Medicine; Lee County Community Hospital; Lonesome Pine Hospital; Dr. German Lizarralde, M.D.; Dr. David Garriott, M.D.; Rob Sawyer, O.D.; Dr. C. Robert Bice, M.D.; Dr. Dennis Aguirre, M.D.; Bristol Surgery Center; Dr. R. Michael Moore, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Lonesome Pine Hospital Emergency Room; Dr. Mark Taylor, M.D.; and John W. Ludgate, Ph.D.

Baker was treated at Wellmont Family Medicine periodically from November 26, 1994, to September 16, 2002. (R. at 73-91.) During this time, he complained of problems such as lower back pain, anxiety, depression, panic attacks, allergies, night sweats, lesions on his right arm, numbness and tingling in the left leg and arm, sinus headaches and urinary symptoms. (R. at 73-91.) Dr. Mark Taylor, M.D., treated Baker during the this time period, and the clinical impressions noted lower back pain, hyperlipidemia, seasonal allergic rhinitis, shortness of breath, chronic prostatitis, anxiety, panic attacks, depression, sinusitis and folliculitis. (R. at 73-91.) He was prescribed medications such as Soma, Lortab, Klonopin, Ultracet, Vioxx, Mobic, Zoloft and Paxil. (R. at 73-91.) A computerized axial tomography, ("CT"), scan of the lumbar spine was performed on May 31, 2001, and revealed a very mild disc bulge at the L4-L5 level. (R. at 91.) No other significant abnormalities were identified, and it was noted that the scan revealed no disc herniation. (R. at 91.) On April 5, 2002,

-8-

Baker underwent a magnetic resonance imaging, ("MRI"), of the lumbosacral discs, which revealed findings within normal limits. (R. at 90.)

Baker presented to the emergency room at Lee County Community Hospital on July 27, 1999, complaining of chest pain, lower back pain and numbness in his left arm and shoulder. (R. at 95.) Baker rated his pain as an eight on a 10-point scale. (R. at 94.) An x-ray of the chest showed no acute process and an electrocardiogram, ("EKG"), yielded normal results. (R. at 98-99.) He was given Toradol and Vistaril to treat his pain and acknowledged that the medications decreased the pain. (R. at 92-93.)

Baker presented to the emergency room at Lonesome Pine Hospital several times between December 10, 2002, and January 18, 2004. (R. at 102-36, 228-30.) During this time period, Baker was diagnosed with chronic headaches, acute exacerbation of chronic headaches, chronic back pain, lumbosacral strain, muscle spasms in his lower back, legs and shoulders, a bee sting and acute gastroenteritis. (R. at 102-36, 228-30.) On December 8, 2002, an x-ray of the abdomen AP and chest showed no significant abnormalities. (R. at 133.) On September 26, 2003, x-rays of the lumbosacral spine were normal. (R. at 128.) Following a motor vehicle accident in October 2003, Baker underwent a CT scan of the brain without contract, which revealed no significant intracranial disease process, and he also underwent x-rays of his left and right femur, pelvis and bilateral hips, left humerus, left shoulder and cervical spine, all of which yielded normal results. (R. at 115-19.) On November 22, 2003, another CT scan of the brain without contrast was performed, which again showed normal results. (R. at 105.) The emergency room physician advised Baker

-9-

to schedule a follow-up appointment with a neurologist. (R. at 104.) Baker's emergency room visits in which he complained of headaches all occurred following the October 2003 motor vehicle accident. (R. at 102-36, 228-30.)

Baker was treated by Dr. German Lizarralde, M.D., and Dr. Harold Schultz, D.O., from January 29, 2003, to January 6, 2005. (R. at 137-78.) On January 29, 2003, Baker presented complaining of lower back pain, which he rated as nine on a 10-point scale. (R. at 162.) Baker explained that his pain began approximately five years prior to this particular visit, noting that it occurred as a result of shoveling coal into his basement. (R. at 162.) He indicated that the pain radiated from his lower back into his legs, and he described the pain as throbbing, sharp and aching. (R. at 162.) Baker claimed that the pain was present at least 75 percent of the time. (R. at 162.) He also claimed that he experienced symptoms such as numbness, weakness, coldness, tingling and sweats. (R. at 162.) Baker explained that his symptoms and/or conditions were aggravated by activities such as standing or sitting for extended periods, lying down, walking, working and sexual activity. (R. at 162.) Dr. Schultz noted that Baker had lower back pain of an undetermined etiology. (R. at 162.) Dr. Schultz decided to refer Baker to a neurologist for a nerve conduction test, and he also prescribed Ultram, Lortab and Vioxx. (R. at 163.) In addition, Baker was referred for psychological counseling. (R. at 163.) Baker saw Dr. Schultz routinely from January 29, 2003, to August 13, 2003, for follow-up appointments regarding lower back pain. (R. at 155-61.) He was prescribed medications such as Ultram, Lortab, Vioxx, Soma, Lipitor and Percocet during this time period. (R. at 155-61.)

Dr. Lizarralde saw Baker on August 14, 2003, due to elevated cholesterol levels

Case 2:08-cv-00068-GMW-PMS   Document 17   Filed 08/17/09   Page 10 of 28   Pageid#: 89

and possible diabetes. (R. at 153-54.) Dr. Lizarralde's assessment included dyslipidemia, obesity and a then-recent history of elevated blood glucose. (R. at 154.) Blood testing was then administered and Baker was advised to follow up in one week. (R. at 154.) Baker returned on August 21, 2003, and testing confirmed a diagnosis of dyslipidemia, but there was no evidence of diabetes mellitus. (R. at 152.)

Baker continued to be treated by Dr. Lizarralde and Dr. Schultz from September 2003 to January 2005, primarily with complaints of back pain and to monitor his cholesterol and blood glucose levels. (R. at 137-51.) The clinical assessments noted chronic lower back pain, dyslipidemia, neck pain, left arm pain, hyperlipidemia, cervical pain of undetermined etiology, shoulder pain of undetermined etiology and hemorrhage in the right inner eye. (R. at 137-51.) Baker was continued on and prescribed medications such as Darvocet, Zocor, Soma, Lortab, Vioxx and Lipitor. (R. at 137-51.) X-rays of the cervical and lumbar spines were performed on January 8, 2004, yielding normal results. (R. at 166.) MRIs of the cervical and lumbar spines without contract were performed on January 10, 2004, indicating normal findings with no evidence of disc herniation or central spinal stenosis. (R. at 164-65.) It also was recommended that Baker continue to see a counselor. (R. at 137-51.)

Baker sought treatment from Dr. David Garriott, M.D., and Dr. Michael J. Winsor, M.D., from January 12, 2004, to November 8, 2004. (R. at 179-90.) On January 12, 2004, Baker complained of a throbbing type headache that was localized over the left part of his head. (R. at 185.) He further explained that the pain was more severe behind his eye on the left side. (R. at 185.) According to Baker, he experienced some type of headache constantly. (R. at 185.) Baker described his neck

-11-

pain as a stabbing pain from the posterior head region down to his shoulder blades bilaterally.  (R. at 185.)  He also reported that his vision was blurred at times, causing him to see double.  (R. at 185.)  Baker indicated that he experienced numbness and tingling in both of his arms, which radiated into all five fingers of both hands and all five toes of both feet.  (R. at 185.)  Baker reported that he had experienced back pain for approximately six to eight years.  (R. at 185.)  In addition, Baker indicated that he suffered from problems such as dizziness, depression, anxiety and trouble with balance and memory.  (R. at 186.) Dr. Winsor's clinical impression noted that Baker's head and neck pain could be caused by post-concussion syndrome from the October 2003 motor vehicle accident.  (R. at 186.)  Dr. Winsor also noted chronic low back and neck pain, depression and chronic pain disorder.  (R. at 186.)  An MRI of the brain was ordered to rule out a significant intracranial abnormality, and Dr. Winsor also ordered an electroencephalogram, ("EEG").  (R. at 187.)  Baker was prescribed Tofranil.  (R. at 187.)

Baker underwent the MRI and EEG on January 16, 2004, and both tests revealed normal findings.  (R. at 189-90.)  Baker returned on February 11, 2004, for a follow-up appointment, at which time Dr. Winsor observed him to be alert, pleasant and cooperative with no facial weakness, nystagmus or diplopia.  (R. at 183.)  Baker's musculoskeletal system showed good muscle strength and bulk in all four extremities and his reflexes were symmetrical or plus one throughout.  (R. at 183.)  Baker was able to walk without assistance and could heel-to-toe walk.  (R. at 183.)  Dr. Winsor found that Baker suffered from post-concussion syndrome with headaches, depression, chronic pain, a reported visual field deficit right inferior and he referenced Baker's normal MRI results and EEG results, which showed no evidence of disease

-12-

within the brain causing visual field deficit. (R. at 183.) Dr. Winsor noted that Baker was to have further testing and was referred to an ophthalmologist for evaluation of his visual field deficit. (R. at 183.) Baker's Tofranil dosage was increased and he was prescribed Midrin to treat his headaches. (R. at 184.)

On February 23, 2004, Baker again saw Dr. Winsor. (R. at 182.) Dr. Winsor noted that Baker's funduscopic examination was normal and that testing revealed that he had decreased red vision in the right eye to 50%. (R. at 182.) Baker's visual field was reported to be constricted on the right side as compared to the left side. (R. at 182.) Baker told Dr. Winsor that he was having headaches three days a week and mild headaches four days a week. (R. at 182.) Dr. Winsor again noted post-concussion syndrome with headaches, depression and chronic pain. (R. at 182.) Dr. Winsor informed Baker that, in light of the fact that his visual disturbance occurred after the accident, it was very unlikely that he had multiple sclerosis. (R. at 182.) Dr. Winsor offered to perform a spinal fluid examination, but informed Baker that, due to his existing back pain, he might not want to proceed with such an option. (R. at 182.) As such, Baker decided to not have the procedure performed. (R. at 182.) Dr. Winsor increased Baker's imipramine dosage and prescribed Fioricet. (R. at 182.) Baker also saw Dr. Winsor on May 4, 2004, and July 6, 2004, and was continued on essentially the same treatment regimen. (R. at 180-81.) Dr. Winsor noted that Baker's headaches were improving due to taking Tofranil. (R. at 180.)

On November 8, 2004, Baker presented to Dr. Garriott for a follow-up appointment and reported that he was "doing pretty good." (R. at 179.) Baker reported that he averaged about two headaches per week, and he indicated that his

-13-

medications seemed to help his problems. (R. at 179.) Dr. Garriott asked Baker to describe a typical day, and Baker explained that he was beginning to get out of the house more. (R. at 179.) Dr. Garriott's clinical impression included chronic headaches, depression and chronic back pain, and he asked that Dr. Schultz consider writing prescriptions for generic Fioricet and Tofranil. (R. at 179.) Dr. Garriott opined that Baker appeared to be reaching the maximum neurological follow-up benefit. (R. at 179.)

A letter dated January 29, 2004, from Rob Sawyer, O.D., to Dr. Winsor referenced Baker's complaints of blurred vision and headaches following his October 2003 motor vehicle accident. (R. at 191.) Sawyer's findings indicated a loss of visual field, but explained that nothing within the ocular findings explained the loss. (R. at 191.) According to Sawyer, nerve damage had occurred. (R. at 191.)

The record indicates that Baker was treated at the Regional Eye Center on February 18, 2004, and April 7, 2004, with complaints of headaches and blurred vision following the October 2003 motor vehicle accident. (R. at 193-94.)

Baker was treated by Dr. Dennis M. Aguirre, M.D., and Dr. John W. Whiteley, M.D., on October 20, 2004, and November 4, 2004, by referral from Dr. Schultz. (R. at 195-99.) On October 20, 2004, Baker reported chief complaints of neck pain, left arm pain, low back pain and alternating bilateral leg pain, which he attributed to the October 2003 motor vehicle accident. (R. at 196.) Following an examination, Dr. Whiteley noted that Baker suffered from cervical and lumbar myofascial strain, as well as a probable closed head injury with secondary concussion, which was being

-14-

managed by neurology.  (R. at 198.)  Dr. Whiteley further noted that he had offered Baker a trial of cervical and lumbar epidural blocks, which Baker was willing to try. (R. at 198.)  Dr. Whiteley opined that, beyond the epidural blocks, he doubted that he could offer much assistance to Baker's pain management.  (R. at 198.)  Baker was prescribed Baclofen, as well as Lidoderm patches.  (R. at 198.)  The epidural injections were administered on October 21, 2004.  (R. at 201.)

On November 4, 2004, Baker presented to Dr. Aguirre for a follow-up appointment.  (R. at 195.)  Baker indicated that the injections helped considerably with his radicular pain, but that the injections did not help his back pain.  (R. at 195.) Dr. Aguirre noted a clinical impression that again included cervical and lumbar myofasical strain, and he recommended two additional epidural steroid blocks.  (R. at 195.)  Baker was prescribed Gabitril and his Baclofen dosage was increased.  (R. at 195.)  Additional epidural injections were administered on November 22, 2004.  (R. at 200.)

Baker was treated by Dr. R. Michael Moore, M.D., from February 2, 2005, to July 25, 2006.  (R. at 202-03, 231-41.)  During this time, Baker complained of lower back pain, tingling in both legs, lower back stiffness and tenderness, headaches, night sweats and panic attacks.  (R. at 202-03, 231-41.)  Baker was diagnosed with conditions such as chronic back pain, high cholesterol, tension headaches, depression, chronic back strain and degenerative disc disease. (R. at 202-03, 231-41.) Dr. Moore prescribed medications such as Lortab, Celexa, Soma, Fioricet, Zocor and Vytorin. (R. at 202-03, 231-41.)

On January 30, 2006, Dr. Moore completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) assessment, in which he found that Baker could occasionally lift and/or carry items weighing less than 10 pounds, frequently lift and/or carry items weighing less than 10 pounds, stand and/or walk for less than two hours in an eight-hour workday and sit for less than two hours in an eight-hour workday. (R. at 204-05.) Dr. Moore determined that Baker's ability to push and/or pull was limited in both his upper and lower extremities. (R. at 205.) In addition, Dr. Moore found that Baker could never climb, balance, kneel, crouch, crawl or stoop. (R. at 205.) Baker also was found to be limited to only occasional reaching in all directions, including overhead reaching. (R. at 206.) No visual or communicative limitations were noted, but Dr. Moore did impose certain environmental limitations, namely exposure to temperature extremes, vibration, humidity/wetness, machinery and heights. (R. at 206-07.) In a medical evaluation form also completed on January 30, 2006, Dr. Moore concluded that Baker was unable to work for a period greater than 90 days, noting a primary diagnosis of chronic back pain and secondary diagnoses of degenerative disc disease and tension headaches. (R. at 234.)

On July 25, 2006, Dr. Moore completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) assessment, in which he found Baker to be moderately limited in his ability to understand, remember and carry out short, simple instructions, to make judgments on simple work-related decisions, to interact appropriately with the public, supervisors and co-workers and in his ability to respond appropriately to work pressures in a usual work setting. (R. at 242-43.) Dr. Moore determined that Baker was markedly limited in his ability to understand, remember

-16-

and carry out detailed instructions and in his ability to respond appropriately to changes in a routine work setting. (R. at 242-43.) Dr. Moore explained that his findings were supported by Baker's depression, chronic headaches and a past closed head injury. (R. at 243.) Lastly, Dr. Moore noted that Baker was capable of managing his benefits in his own best interests. (R. at 244.)

On March 15, 2005, Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), in which he found that Baker could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds and stand/sit or walk for a total of about six hours in a typical eight-hour workday. (R. at 209.) Dr. Surrusco also found that Baker was unlimited, other than that needed to lift and/or carry, in his ability to push and/or pull. (R. at 209.) No postural, manipulative, visual, communicative or environment limitations were noted. (R. at 210-11.) Dr. Surrusco's findings were affirmed by Dr. Donald R. Williams, M.D., on June 25, 2005. (R. at 213.)

Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on March 15, 2005, noting that the assessment covered the time period from April 22, 2003, to March 15, 2005. (R. at 215-27.) Leizer found Baker's impairment to be non-severe and indicated that he suffered from a co-existing non-mental impairment that required referral to another medical specialty. (R. at 215.) He also found that Baker had an affective disorder, but noted that the medically determinable impairment did not precisely satisfy the diagnostic criteria. (R. at 218.) Leizer noted no limitations as to Baker's activities of daily living

-17-

and noted no episodes of decompensation. (R. at 225.) Baker was found to be mildly limited in maintaining social functioning, concentration, persistence and pace. (R. at 225.) Leizer found that Baker's allegations of disability were not credible, noting that Baker should be able to perform all levels of work. (R. at 227.) This PRTF was affirmed by E. Hugh Tenison, Ph.D, on June 29, 2005. (R. at 215.)

John W. Ludgate, Ph.D., administered a psychological evaluation on July 10, 2006. (R. at 254-59.) Ludgate noted that Baker was not employed at the time of the evaluation, but, apparently, Baker informed him that he did indeed work earlier in 2006. (R. at 255.) Baker reported several restrictions regarding his daily routine, stating that he could not drive, sit or stand for extended periods. (R. at 255.) Baker also reported that he could only perform light housework, but acknowledged that he could operate a riding lawnmower for short periods. (R. at 255.) Baker further noted that, other than performing some light housework, he mostly watched television or would lie down. (R. at 256.) Baker complained of middle and lower back pain, which he rated as eight to nine on a 10-point scale, as well as tingling down his legs, headaches, visual problems, depression, anxiety, sleep disturbance and social withdrawal. (R. at 256.)

Ludgate noted that Baker presented in a pleasant and cooperative manner and that he complied with all aspects of the evaluation. (R. at 256.) Ludgate further noted that Baker appeared to be clinically depressed, anxious and tense, noting that Baker claimed to be in a lot of pain on the day of the evaluation due to the automobile journey to the office. (R. at 256.) Ludgate indicated that Baker had to stand approximately four times due to his pain, commenting that Baker apparently could

-18-

only sit for short periods of time, such as 20 to 30 minutes, before he began to experience severe pain. (R. at 256-57.) Ludgate opined that Baker's comprehension was somewhat limited, but that it was sufficient for testing. (R. at 257.) Baker's concentration was found to be adequate and there was no evidence of psychosis or thought disorder. (R. at 257.) Baker's judgment and insight were good, and he was oriented to time, place and person. (R. at 257.) Ludgate noted that Baker's short-term memory appeared to be somewhat impaired. (R. at 257.)

Ludgate administered a Structured Clinical Interview for Diagnosis, ("SCID"), which showed that Baker met the criteria for generalized anxiety disorder and mood disorder, secondary to his medical condition. (R. at 257.) The Minnesota Multiphasic Personality Inteventory - Second Edition ("MMPI-2"), was within the normal range, indicating that the results obtained with Baker were valid and representative of real problems rather than due to some test-taking bias. (R. at 257.) The clinical scales revealed significant and handicapping problems in the areas of depression and anxiety. (R. at 257.) The Beck Depression Inventory assessment showed moderate depression due to symptoms of hopelessness, desire to cry, lack of enjoyment, low motivation and sleep disturbance. (R. at 257.) The Beck Anxiety Inventory revealed moderate anxiety due to symptoms of apprehension, inability to relax and shakiness. (R. at 257.) Ludgate also administered the Wechsler Adult Intelligence Scale - Revised, ("WAIS-R"), on which Baker obtained a full scale IQ score that placed him in the low average range of intelligence. (R. at 258.) Baker's verbal IQ was somewhat lower in the upper end of the borderline range of intelligence, and he exhibited a performance IQ in the low average range. (R. at 258.) Ludgate noted that the scores reflected the fact that Baker likely underachieved in school relative to his potential, which was still

-19-

below average. (R. at 258.) Ludgate further noted that Baker's verbal and numerical skills were well below average and represented a mild handicap. (R. at 258.)

Ludgate reported that Baker was likely to continue to have psychological problems related to his pain and disability in the future. (R. at 258.) He opined that Baker's prognosis was guarded, unless his pain could be relieved. (R. at 258.) Ludgate also opined that, in his professional opinion, Baker was unable to engage in gainful employment at the time of the evaluation due to the severity of his medical and psychological problems. (R. at 258-59.) Furthermore, Ludgate indicated that Baker's poor literacy skills and below average cognitive abilities would make it difficult for him to work in a job which was less physical in nature. (R. at 259.) Lastly, Ludgate noted that Baker's depression and anxiety would impair his performance in any employment setting. (R. at 259.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2008).

-20-

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 25, 2006, the ALJ denied Baker's claim. (R. at 10-20.) The ALJ found that Baker had not engaged in any substantial gainful activity since August 1, 1997, the alleged onset date. (R. at 14.) The ALJ determined that the medical evidence established that Baker suffered from severe impairments, namely back pain, cervical pain, depression and anxiety. (R. at 14.) However, he found that Baker's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ further found that Baker retained the residual functional capacity to perform simple, low stress light work. (R. at 17.) Thus, he determined that Baker was unable to perform his past relevant work. (R. at 18.) In addition, the ALJ noted that transferability of job skills was immaterial to the determination of disability because using the Medical-Vocational Rules as a framework support a finding that Baker was not disabled, regardless of whether he possessed transferable job skills. (R. at 19.) Based on Baker's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that there were jobs existing in

Case 2:08-cv-00068-GMW-PMS   Document 17   Filed 08/17/09   Page 21 of 28   Pageid#: 100

significant numbers in the national economy that Baker could perform, including jobs such as a grader/sorter, a houseman, a janitor, a farm worker, a hand packer, a laborer and a machine tender. (R. at 19.) Therefore, the ALJ concluded that Baker was not under a disability as defined in the Act and was not entitled to benefits. *See* 20 C.F.R. § 416.920(g) (2008).

Baker argues that the ALJ's residual functional capacity finding is not supported by substantial evidence of record, contending that the medical evidence demonstrates that he is more limited than found by the ALJ. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-10.) Baker also argues that the ALJ erred by failing to adhere to the treating physician rule, thus failing to accord proper weight to the medical opinions of Dr. Moore. (Plaintiff's Brief at 10-12.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical

evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Baker's contention that the ALJ's residual functional capacity determination is unsupported by substantial evidence of record. In this case, the ALJ determined that Baker retained the residual functional capacity to perform simple, low stress light work. (R. at 17.) After reviewing the medical evidence before the court, I find that the ALJ's residual functional capacity determination is supported by substantial evidence of record.

The court notes that the state agency opinions are in agreement with the ALJ's findings. In particular, on March 15, 2005, Dr. Surrusco, a state agency physician, completed a PRFC in which he found that Baker could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds and stand/sit or walk for a total of about six hours in a typical eight-hour workday. (R. at 209.) Dr. Surrusco also found that Baker was unlimited, other than that needed to lift and/or carry, in his ability to push and/or pull. (R. at 209.) No

postural, manipulative, visual, communicative or environment limitations were noted. (R. at 210-11.)  Dr. Surrusco's findings were affirmed by Dr. Williams on June 25, 2005.  (R. at 213.)

In addition, Leizer, a state agency psychologist, found Baker's mental impairments to be non-severe.  Specifically, he found that Baker had an affective disorder, but noted that the medically determinable impairment did not precisely satisfy the diagnostic criteria.  (R. at 218.)  Leizer noted no limitations as to Baker's activities of daily living and noted no episodes of decompensation.  (R. at 225.)  Baker was found to be mildly limited in maintaining social functioning, concentration, persistence and pace.  (R. at 225.)  Leizer found that Baker's allegations of disability were not credible, noting that Baker should be able to perform all levels of work.  (R. at 227.)  This PRTF was affirmed by Tenison, another state agency psychologist, on June 29, 2005.  (R. at 215.)

Not only do the opinions of the state agency physicians and psychologists fall in line with the ALJ's residual functional capacity finding, but the record also contains significant objective medical findings that support the ALJ's ultimate decision.  For example, the medical evidence of record includes several x-rays, CT scans and MRIs. A CT scan of the lumbar spine performed in May 2001 revealed only a very mild disc bulge at L4-L5, and no other significant abnormalities were identified.  (R. at 91.) Other than the May 2001 CT scan that showed only a mild disc bulge, the remaining objective testing yielded normal results.  In fact, x-rays, MRIs and CT scans taken in July 1999, April 2002, December 2002, September 2003, October 2003, November 2003 and January 2004 all revealed normal findings.  Despite Baker's contention that

-24-

he is more physically limited that found by the ALJ, I am of the opinion that the objective findings of record demonstrate that Baker's physical limitations are not as severe as alleged. Accordingly, the court finds that the ALJ's residual functional capacity finding is supported by substantial evidence.

Next, Baker argues that the ALJ erred by failing to adhere to the treating physician rule and, thus, erred by rejecting the opinion of Dr. Moore. (Plaintiff's Brief at 10-12.) Based on my review of the ALJ's consideration of the evidence of record, I find this argument to be without merit.

It is well-settled that the ALJ is required to consider objective medical facts and the opinions and diagnoses of both treating and examining professionals, which constitute a major part of the proof of disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(d)(2) (2008). However, despite this general rule, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).[7] In fact, "if a physician's opinion is not supported by the clinical evidence or if it is

[7]*Hunter* was superceded by 20 C.F.R. § 416.927(d)(2), which states, in relevant part, as follows:

If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

-25-

inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Baker was treated by Dr. Moore from February 2, 2005, to July 25, 2006. (R. at 202-03, 231-41.) Baker was diagnosed with conditions such as chronic back pain, high cholesterol, tension headaches, depression, chronic back strain and degenerative disc disease. (R. at 202-03, 231-41.) Dr. Moore prescribed medications such as Lortab, Celexa, Soma, Fioricet, Zocor and Vytorin. (R. at 202-03, 231-41.)

On January 30, 2006, Dr. Moore completed a Medical Source Statement Of Ability To Do Work-Related Activities (Physical) assessment, in which he found that Baker could occasionally lift and/or carry items weighing less than 10 pounds, frequently lift and/or carry items weighing less than 10 pounds, stand and/or walk for less than two hours in an eight-hour workday and sit for less than two hours in an eight-hour workday. (R. at 204-05.) Dr. Moore determined that Baker's ability to push and/or pull was limited in both his upper and lower extremities. (R. at 205.) In addition, Dr. Moore found that Baker could never climb, balance, kneel, crouch, crawl or stoop. (R. at 205.) Baker also was found to be limited to only occasional reaching in all directions, including overhead reaching. (R. at 206.) No visual or communicative limitations were noted, but Dr. Moore did impose certain environmental limitations, namely exposure to temperature extremes, vibration, humidity/wetness, machinery and heights. (R. at 206-07.) In a medical evaluation form also completed on January 30, 2006, Dr. Moore concluded that Baker was unable to work for a period greater than 90 days, noting a primary diagnosis of chronic back pain and secondary diagnoses of degenerative disc disease and tension

headaches.  (R. at 234.)

On July 25, 2006, Dr. Moore completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) assessment, in which he found Baker to be moderately limited in his ability to understand, remember and carry out short, simple instructions, to make judgments on simple work-related decisions, to interact appropriately with the public, supervisors and co-workers and in his ability to respond appropriately to work pressures in a usual work setting.  (R. at 242-43.)  Dr. Moore determined that Baker was markedly limited in his ability to understand, remember and carry out detailed instructions and in his ability to respond appropriately to changes in a routine work setting.  (R. at 242-43.)  Dr. Moore explained that his findings were supported by Baker's depression, chronic headaches and a past closed head injury.  (R. at 243.)  Lastly, Dr. Moore noted that Baker was capable of managing his benefits in his own best interests.  (R. at 244.)

Dr. Moore clearly imposed severe restrictions on Baker, essentially finding that he was unable to work.  However, the record contains evidence  that is inconsistent with Dr. Moore's findings.  As discussed earlier, the opinion evidence of the state agency physicians and psychologists, as well as the objective findings contained in numerous x-rays, CT scans and MRIs, support the residual functional capacity finding of the ALJ.  Therefore, because Dr. Moore's findings were inconsistent with other substantial evidence of record, I am of the opinion that the ALJ was justified in not according significant weight to Dr. Moore's opinions.  *See Craig*, 76 F.3d at 590.

*IV.  Conclusion*

-27-

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Baker's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This 17th day of August 2009.

/s/   *Glen M. Williams*
SENIOR UNITED STATES DISTRICT JUDGE